# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 13, 2025         Decided October 10, 2025

No. 24-3033

UNITED STATES OF AMERICA,
APPELLEE

v.

MARK L. CLARK,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cr-00151-1)

*Christopher Macchiaroli*, appointed by the court, argued the cause and filed the briefs for appellant.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Matthew M. Graves*, U.S. Attorney, at the time the brief was filed, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Michael Truscott*, and *George Eliopoulos*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, WILKINS, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Mark Lamont Clark was an officer with the Metropolitan Police Department ("MPD") in Washington, D.C., for over three decades.  Within the span of five days, at the end of his career with MPD, Clark used prohibited neck restraints on two separate individuals while on duty.  After a grand jury indicted Clark on five charges based upon these two incidents, a jury found Clark guilty of two counts of depriving the individuals of their rights under color of law in violation of 18 U.S.C. Section 242.  He was sentenced to concurrent terms of six months incarceration for each count, followed by twenty-four months of supervised release.  Clark timely appealed his convictions to this Court.  Because each of Clark's challenges fail, we affirm.

**I.**

**A.**

We summarize the evidence in the light most favorable to the jury verdict based on Clark's body-worn camera ("BWC") footage, the District Court's factual findings, and excerpts of the trial transcripts provided in the record.  *See Bryan v. United States*, 524 U.S. 184, 189 (1998) (explaining that when reviewing a criminal jury conviction, appellate courts accept the government's version of the evidence).

On the evening of July 13, 2018, Clark went to the McDonald's at 3rd and C Street, Southwest, towards the end of his shift.  After picking up his food, Clark became involved in a confrontation with a group of young people inside the restaurant.  Ex. A1 at 8:35–9:34.  Clark approached one of the young men, got very close to the front of his body and began to walk forwards (referred to as "walking down").  To avoid making contact with Clark, the young man walked

backwards and bumped into a pillar and another officer, Officer George Baldwin. *Id*. at 8:41–9:03. Clark proceeded to follow the young man around the restaurant, before eventually exiting while the young man and the rest of his group stayed inside talking to Officer Baldwin. *Id*. at 9:03–9:45.

However, instead of leaving the vicinity of the McDonald's, Clark mounted his motorcycle and stayed out front, watching the young men inside through the large glass windows. Ex. A3 at 0:00–0:29. When one of the young men walked outside of the restaurant, Clark put on his helmet and took off on his motorcycle. *Id*. 0:29–1:17. Clark rode his motorcycle around the corner where another door to the restaurant led and saw some of the young men previously inside the restaurant now standing outside on the sidewalk. *Id*. at 1:17–1:27. A witness testified that Clark complained of something hitting him on the back of his helmet as he rode away. Trial Tr. 437:7–25. Clark passed the young men and turned his motorcycle around, pulling onto the sidewalk to ride back towards them. Clark drove up to where the young men were standing and stopped within a very short distance in front of them. Ex. A3 at 1:27–1:33.

The young men began to yell at Clark after he stopped in front of them. *Id*. at 1:34–35. Clark got off his motorcycle and made physical contact with Daquan Toland because Toland did not move back as Clark stepped closer to him. *Id*. at 1:34–37. Although "agitated because of the situation[,]" neither Toland nor his friends "appear[ed] to be . . . presenting any type of aggressive threat towards [Clark]." Trial Tr. 1284:2–14. Clark then reached out and wrapped his hands around Toland's neck—performing a MPD-prohibited trachea hold—and proceeded to walk Toland backwards towards Officer Baldwin's police car parked on the curb about 30–60 feet away. Ex. A3 at 1:40–50; Trial Tr. 1285–88. As Clark

pushed Toland back with his hands wrapped around Toland's neck, Toland "attempt[ed] to defend himself" by "grabbing at [Clark], trying to get [Clark] to let go." Trial Tr. at 1286:2–4. Clark turned Toland around so the front of Toland's body was against the side of the police car. Ex. A3 at 1:51–2:35.

As Clark had Toland pinned facing the police car, Clark kept one hand around the back of Toland's throat and handcuffed Toland's hands behind his back. *See* Trial Tr. 1289:4–12. Clark held Toland in that position until more officers arrived on the scene. Ex. A-3 at 3:12–5:06.

After Toland was arrested he complained of pain in his right leg and was treated for his injury at Howard University Hospital.

**B.**

On July 18, 2018, five days after the incident with Toland, Clark was working as a security guard and as an authorized MPD officer at another McDonald's location on Good Hope Road in Southeast, Washington, D.C. At some point during Clark's shift, Kenneth Coleman attempted to use the restroom inside of the McDonald's. Clark denied Coleman access to the restroom, turned on his BWC, and radioed for a Sergeant Supervisor to respond to the McDonald's at Coleman's request so that Coleman could file a citizen's complaint. Ex. B-1.1, 2:04–2:41.

While Clark sat in a chair with his headphones on, he faced Coleman who was standing some feet away from him. Clark's BWC footage showed Coleman looking at his cell phone screen, with wired-headphones in his ears, waiting for Clark's supervisor to arrive. Ex. B-1.1, 2:40.

After Clark let Coleman know that a supervisor was on the way, Clark asked Coleman for his name and told him that he would be barred from that McDonald's location after Coleman had the chance to speak with Clark's supervisor. *Id.* at 02:37–03:10. Coleman began to argue with Clark about why he would be barred from the restaurant. *Id*. at 3:11–3:25. As the two continued to argue, Clark told Coleman to "back up a little . . . because [Coleman] was getting a little too close." *Id*. at 3:53–4:00. Clark also accused Coleman of doing drugs. *Id*. at 3:47–49. Coleman denied doing drugs, moved away from Clark and continued to look down at his phone in silence. *Id*. at 3:49–3:59.

As Coleman was occupied with his phone, Clark asked Coleman "you understand what I'm saying? You understand what I'm telling you?" *Id*. at 4:00–4:02. Clark then removed his own headphones and said, "see I'm about to take this off right now because you getting a little too close." *Id*. at 4:02–05. Clark said this despite the fact that Coleman had not moved from his position a few feet away from Clark and remained occupied, looking at his cell phone screen. *Id*. at 4:00–05. Clark then asserted "now, you want to try me, try me." *Id*. at 4:06–09. Coleman put his phone down by his side, and responded in a quiet tone, "do what you do." *Id*. at 4:09–10. Clark then repeatedly threatened Coleman to "take that step forward," to which Coleman repeatedly responded, "do what you do." *Id*. at 4:11–4:27. Coleman then told Clark, "don't even worry about it, I got you." *Id*. at 4:27–28. Clark responded in an elevated tone, "I know you got me. You better have me, because imma' have you. Okay, imma' have you." *Id*. at 4:28–4:36.

Coleman then walked away from Clark while saying "you better believe, you going to be sick. You won't have your mother fucking job." *Id*. at 4:37–4:41. Clark responded,

"alright. Okay, alright. Yep, yep. Y'all been saying that for ten years around this neighborhood and I'm still here." *Id*. at 4:41–4:47. Coleman yelled "the only thing you running is your fucking mouth. And you sitting here like a fat bitch." *Id*. at 4:50–4:53. After the two continued to argue back and forth, Coleman walked closer to where Clark was sitting. *Id*. at 5:05–5:06.

All of a sudden, Clark leaped up from his chair, lunged towards Coleman, and wrapped his hands around Coleman's neck while pushing Coleman back towards a corner of the restaurant. *Id*. at 5:06–5:16. Clark pinned Coleman against a corner in the restaurant with his hands still wrapped around Coleman's neck and yelled at Coleman to put his hands behind his back. *Id*. at 5:16–5:18. Startled, Coleman put his hands out on either side of him and responded that he was "not doing nothing." *Id*. at 5:18–5:25. With his hands still wrapped around Coleman's throat, Clark pinned Coleman to another wall of the restaurant. *Id*. at 5:26–5:33. Coleman exclaimed "why you choking me yo, you're choking me!" *Id*. at 5:35–5:39. Clark continued to hold Coleman in various MPD-prohibited carotid artery holds and trachea holds for about two minutes while Coleman can be heard gurgling and struggling to breathe. *Id*. at 5:40–7:22. When another officer arrived at the scene, Coleman was handcuffed and taken outside of the restaurant. *Id*. at 7:37–9:10.

## C.

A grand jury indicted Clark on five charges related to these incidents. Count One of the indictment related to Clark's actions against Toland, and stated that:

> On or about July 13, 2018, in the District of Columbia, the defendant, MARK L. CLARK,

while acting under color of law as a [MPD] Officer, willfully deprived [Toland] . . . of the right, secured and protected by the Constitution and the laws of the United States, to be free from an unreasonable seizure, which includes the right to be free from the use of unreasonable force by a law enforcement officer. Specifically, CLARK assaulted [Toland] and used a prohibited trachea hold without legal justification. The offense resulted in bodily injury to [Toland] (All in violation of Title 18, United States Code, Section 242 (Deprivation of Rights Under Color of Law)).[1]

Count Three alleged substantially the same as Count One, but was instead related to Clark's use of force against Coleman and alleged that Clark used a prohibited carotid artery hold in addition to the prohibited trachea hold during Coleman's arrest. The other three charges in the indictment were dropped the day before the case proceeded to trial.

---

[1] 18 U.S.C. Section 242 provides that:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section . . . shall be fined under this title or imprisoned not more than ten years, or both[.]

At the close of evidence, and before excusing the jury to deliberate, the District Court instructed the jury that in order to find Clark guilty of violating 18 U.S.C. Section 242, Counts One and Three, it needed to find that: (1) "[Clark] acted under color of law"; (2) "[Clark] deprived a person present in the United States of a right secured or protected by the Constitution or laws of the United States"; (3) "[Clark] acted willfully"; and (4) "the offense resulted in bodily injury." A. 1049, 1224. The District Court also gave a detailed instruction to the jury as to the willfulness element which we discuss *infra* in section II(A) of this opinion. After five days of jury deliberations, the jury returned a guilty verdict as to both Counts.

Clark unsuccessfully moved for a judgment of acquittal, both at the close of the government's case and the close of all evidence. Clark also moved for a new trial contending that (1) the District Court improperly instructed the jury on the willfulness element of Section 242; (2) the evidence was insufficient for a reasonable jury to conclude Clark acted willfully; and (3) the evidence was insufficient to prove Clark used excessive force which resulted in bodily injury to Toland. The District Court denied the motion and sentenced Clark to six months imprisonment, followed by twenty-four months of supervised release for each Count to be served concurrently.

## II.

Clark timely appealed his convictions to this Court. He contends that: (1) the District Court improperly instructed the jury as to the willfulness element under Section 242; (2) the government presented insufficient evidence as to certain elements required under Section 242 to convict him; (3) the government sought to impose liability outside of the charges included in the indictment; (4) the District Court erred in

answering the jury's questions; and (5) the District Court erred in certain evidentiary rulings.

We have jurisdiction to review Clark's appeal under 28 U.S.C. section 1291. We reject each of his contentions.

**A.**

**1.**

We first decide whether the District Court erred in instructing the jury as to the willfulness element in Section 242.

We begin by determining the applicable standard of review. "When reviewing a challenge to jury instructions, '[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of th[e] issues and applicable standards.'" *United States v. Vega*, 826 F.3d 514, 524 (D.C. Cir. 2016) (quoting *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010)). Additionally, "[w]hile the propriety of a submitted jury instruction is reviewed *de novo,* 'the choice of language to be used in a particular instruction…is reviewed only for abuse of discretion'" unless the issue has not been preserved. *Vega*, 826 F.3d at 524 (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993)). We review unpreserved issues for plain error. *United States v. Purvis*, 706 F.3d 520, 522 (D.C. Cir. 2013).

To demonstrate plain error, a defendant must show: (1) there was "an error that has not been intentionally relinquished or abandoned"; (2) the error was "plain—that is to say, clear or obvious"; and (3) "the error . . . affected the defendant's substantial rights, . . . which in the ordinary case means he or she must 'show a reasonable probability that, but for the error,'

the outcome of the proceeding would have been different[.]" *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 732–34 (1993)); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004). If the defendant makes this showing, we will "exercise [our] discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Olano*, 507 U.S. at 736) (internal quotations omitted).

In his opening brief, Clark contends that he preserved his objection to the District Court's instruction on willfulness because he initially submitted the following proposed jury instruction, which was different than the final instruction given by the District Court:

> The government must show that . . . Clark had the specific intent to deprive [Coleman or Toland] of his right not to be subjected to unreasonable and excessive force. If you find that a defendant knew what he was doing and that he intended to do what he was doing, and if you find that he did violate a constitutional right, then you may conclude that the defendant acted with the specific intent to deprive the victim of that constitutional right.

A. 1232. For its part, the government proposed a willfulness jury instruction relying, in part, on a treatise[2] and the Third Circuit's opinion in *United States v. Figueroa*, 729 F.3d 267, 277 (3d Cir. 2013). The government's proposed jury instruction included language that "it [was] not necessary for

---

[2] *See* 2 KEVIN F. O'MALLEY ET AL., FED. JURY PRAC. & INSTRUCTIONS § 29:05 (6th ed. 2025 & Supp. 2019).

[the jury] to find that [Clark] knew that he was violating a specific law or constitutional provision" or have "familiarity with the Constitution or with the particular constitutional right involved." *See* A. 1231.

The District Court asked Clark whether he would agree to willfulness instructions if they aligned with what the government proposed *supra*, and Clark stated that he would not "have an objection to that." A. 33–34, Trial Tr. 1221–22. Additionally, before the District Court "instructed the jury, Clark stated that he had 'no objections to the instructions, in their entirety[.]'" A. 1227–28 (quoting Trial Tr. 2029); *see also* Oral Arg. Tr. 5:5–23 (when asked at oral argument whether he objected to the District Court's final jury instructions, counsel for Clark stated "[t]o answer your question, Your Honor, I don't want to dance around it. Ultimately, when the judge says, are [there] any more objections? I did not object.").

Accordingly, the District Court's final instruction to the jury to determine whether Clark acted willfully, or "with the specific intent to interfere with [Toland] or Coleman's right not to be subjected to unreasonable force" stated as follows:

> It is not necessary for you to find that the Defendant knew that he was acting unlawfully or that he was violating a specific law or constitutional provision. You may find that a defendant acted willfully even if you find that he had no real familiarity with the Constitution or with the particular constitutional right involved. You must, however, find that the Defendant intended to use more force than was reasonable under the circumstances.

A. 1227.

Because Clark failed to object to the District Court's final jury instruction, and in fact explicitly stated on the record that he did not have an objection to the jury instruction as given, his challenge is only subject to plain error review. *See Purvis*, 706 F.3d at 522 (holding that when a party fails to object to a jury instruction, and instead pronounces himself satisfied with the instruction, we review the challenged jury instruction for plain error).

**2.**

Clark contends that the District Court's willfulness jury instruction was "legally deficient" because of the following portion of the first sentence: "It is not necessary for you to find that the Defendant knew that he was acting unlawfully[.]" A. 1227–28; Appellant Br. 18. Clark argues that the jury should have been instructed to instead find that "he intended to engage in unlawful conduct and *did so knowing that it was wrong or unlawful*[.]" Appellant Br. 18 (emphasis in original). Clark contends that this language would have aligned with "criminally willful conduct" under "existing precedent." *Id*. Instead, according to Clark, the allegedly erroneous language included in the jury instructions allowed the jury to convict him based on reckless disregard of the law, which is contrary to precedent and a lesser state of mind than a knowing violation of the law. *Id.* at 18–27.

There are several reasons why Clark has not shown that the instruction given was plain error. To start, even if the instructions conveyed a reckless disregard standard, the governing precedent does not support Clark's contention that he cannot be convicted based on that standard. For example, in *Screws v. United States*, 325 U.S. 91 (1945) (plurality

opinion),[3] which involved a predecessor statute substantially similar to 18 U.S.C. Section 242, law enforcement-defendants were convicted of beating a Black man to death after arresting him and before he was found guilty of committing a crime. On appeal, the Supreme Court reversed the defendants' conviction because the jury was not properly instructed regarding the specific intent required to find defendants guilty of violating then-18 U.S.C. section 20.   325 U.S. at 94–107. Instead, the jury in *Screws* was merely instructed that "if the[] defendants, without [it] being necessary to make the arrest effectual or necessary to their own personal protection, beat this man, assaulted him or killed him while he was under arrest, then they would be acting illegally under color of law, as stated by this statute."   *Id.* at 94.   In other words, the jury was not instructed that the defendants had to have any particular state of mind at all, so long as they beat the victim and did so without justification.   The Court held that this was an error, because the "question of intent was not submitted to the jury with the proper instructions."   *Id.* at 106.

To remedy the intent instruction, the Court explained that the jury, on remand, had to find that defendants "act[ed] willfully . . . [when] they act[ed] in open defiance *or in reckless disregard* of a constitutional requirement which has been made specific and definite."   *Id.* at 105 (emphasis added). The Court reiterated several times that acting in reckless disregard of constitutional rights constitutes willfulness, in addition to acting with a purpose of violating constitutional

---

[3] *Screws* is referred to as "[t]he seminal case dealing with the element of mens rea under section 242[.]"   *United States v. Ehrlichman*, 546 F.2d 910, 920 (D.C. Cir. 1976); *see also United States v. Reese*, 2 F.3d 870, 880 (9th Cir. 1993) ("[T]he Supreme Court's plurality opinion in *Screws* . . . remains the touchstone for analysis" of jury instructions under Section 242.).

rights.  *See id.* at 104, 105, 106; *see also id.* at 118, 130 (Rutledge, J., concurring).

We agreed 30 years later in *Ehrlichman*, a case involving section 241—the conspiracy sister statute to Section 242[4]— where we construed *Screws* to mean that "even if the defendant did not in fact recognize the unconstitutionality of his act, he will be adjudged as a matter of law to have acted 'willfully' i.e., '*in reckless disregard* of constitutional prohibitions or guarantees.'"  546 F.2d at 921 (emphasis added).  Thus, Clark's contention that it was an error, let alone a clear and obvious error, to permit a conviction based on a "reckless disregard" standard as opposed to a "knowing violation" finds no support in our precedent.

Clark then points to the Supreme Court's opinion in *Bryan*, decided subsequent to *Screws* and *Ehrlichman*, considering issues relating to 18 U.S.C. sections 922(a)(1)(A)[5] and 924(a)(1)(D)[6], which prohibit dealing in firearms without a federal license.  524 U.S. at 189–90, 193–94.  Clark asserts that *Bryan* supports his argument that a conviction under Section 242 cannot be based on mere recklessness and instead requires knowledge of the law at issue.  But Clark is again mistaken.  In *Bryan*, the jury was instructed that "[a] person

---

[4] "The same principles apply to prosecutions for conspiracy under section 241" as apply to Section 242, and "the Supreme Court has made clear since *Screws* that the 'specific intent' requirements of section 242 are equally applicable (or derivatively applicable) to section 241."  *Ehrlichman*, 546 F.2d at 921.

[5] Section 922(a)(1)(A) makes it unlawful for any person to engage in the business of dealing firearms without a federal license.

[6] Section 924(a)(1)(D) imposes criminal penalties on whoever willfully violates any provision of Chapter 44.

acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law." *Id.* at 190. The Court upheld the instruction. *Id.* at 199. While Clark is correct that *Bryan* upheld a willfulness instruction that required knowledge that one's conduct is unlawful—and so required more than recklessness—*Bryan* construed willfulness in a different statute, not Section 242. Clark also cites to other cases where courts have expressly concluded that willfulness cannot be satisfied with a reckless state of mind. Appellant Br. 23–27. But all of those cases, like *Bryan*, involved statutes other than Section 242, and as the Court explained in *Screws*, "'willful' is a word 'of many meanings, its construction often being influenced by its context.'" 325 U.S. at 101 (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *see also Bryan*, 524 U.S. at 191 (same, citing *Spies*). Willfulness generally requires proof that the defendant intentionally committed the act and did so with a "bad purpose." *Screws*, 325 U.S. at 101. The rub is how the "bad purpose" manifests itself with each particular statute. Here, *Screws* and *Ehrlichman* have squarely held that in the context of Section 242, "willfully" can be proven by acting in reckless disregard of a clearly delineated constitutional right.

Clark seizes upon the fact that in *Bryan*, the Court held it was a misstatement of law to instruct the jury that "[i]n this case, the government is not required to prove that the defendant knew that a license was required, *nor is the government required to prove that he had knowledge that he was breaking the law*." *Bryan*, 524 U.S. at 199 (emphasis in original). Instead, the Court held that the latter phrase should have been worded to say "nor is the government required to prove that he had knowledge that he was breaking the law . . . *that required a license*[.]" *Id.* (emphasis added). But again, *Bryan* involved a statute prohibiting the sale of firearms without a

required federal firearms license, a different context than Section 242. In *Ehrlichman*, we expressly stated that "[t]here is no requirement under section 241 that a defendant recognize the unlawfulness of his acts," 546 F.2d at 922, which is the precise language that Clark now asserts was erroneous (though he did not object below). We explained that so long as the act violates a clearly defined constitutional right (which Clark does not challenge here), it is considered "willful" within the context of Section 242 if the jury finds that the defendant committed the act with the specific purpose of depriving the victim of that right. *Id.*

In other words, where there is a clearly delineated right and the defendant acts with a purpose to deprive the victim of the interests protected by that right, the defendant is willfully trampling on the victim's constitutional rights, even if he did not in fact "recognize the unlawfulness of his acts." *Id.* Thus, a jury finding that the defendant did not recognize the unlawfulness of his acts is not exculpatory. The act is still "willful," because even if not intentional, it is nonetheless reckless. Where the "constitutional right at issue [is] clearly delineated and plainly applicable under the circumstances of the case," and the defendant acted "with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that federal right," then "he will be adjudged as a matter of law to have acted 'willfully' i.e., 'in reckless disregard of constitutional prohibitions or guarantees.'" *Id.* at 921 (quoting *Screws*, 325 U.S. at 106). This is so "even if the defendant did not in fact recognize the unconstitutionality of his act." *Id.*

The Fourth Amendment confers several rights, including "[t]he right of the people to be secure in their persons[.]" U.S. Const. Amend. IV. That right, in turn, protects several interests, such as the protection against detention without

adequate justification, protection against the use of excessive force, and protection against the search of one's personal effects without sufficient cause. Here, the interest at issue is the protection against the use of excessive force. Thus, following *Ehrlichman*, Clark's acts were "willful" within the meaning of Section 242 if he committed them with the purpose and intent to use excessive force against the victims, even if he was not thinking specifically about the Fourth Amendment when he acted. This is because Clark's purpose to use excessive force, if proven, demonstrates that he acted in reckless disregard of the right of citizens to be secure in their persons, which constitutes willfulness within the meaning of Section 242. *See Ehrlichman*, 546 F.2d at 921.

Clark cannot demonstrate plain error where the District Court followed *Erlichman*, binding precedent in the relevant context. Here, the jury was told that "the Defendant acted 'willfully' if he acted with the specific intent to interfere with Daquan Toland's or Kenneth Coleman's right not to be subjected to unreasonable force." A. 1227. The jury was further told that they "must . . . find that the Defendant intended to use more force than was reasonable under the circumstances." *Id.* Thus, in order to convict, the jury was twice explicitly instructed that they were required to find that Clark had the specific intent to use unreasonable force on the victims. This language was consistent with the instructions we approved in *Ehrlichman*, which required proof of a purpose and intent to enter the victim's office without a warrant or permission. 546 F.2d at 928. There was no plain error here. *See United States v. Park*, 421 U.S. 658, 675 (1975) (viewing jury instructions "as a whole" and holding no plain error where the instructions were not "misleading and contained an adequate statement of law to guide the jury's determination.").

**B.**

We next address Clark's contention that insufficient evidence was presented to the jury to sustain convictions that he acted willfully, used excessive force, and—as related to Toland—caused bodily injury in violation of Section 242. For the reasons clearly explained by the District Court, we affirm. *See* A. 1236–42.

We review a sufficiency of the evidence claim *de novo*, and consider the evidence presented at trial in the light most favorable to the government. *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002). We "will affirm a conviction where 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006) (emphasis removed) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard sets an "exceedingly heavy burden" for an appellant to overcome. *Id.* "[F]ull play" is given to the jury "to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010) (quoting *United States v. Carson*, 455 F.3d 336, 368–69 (D.C. Cir. 2006)) (internal quotation marks omitted).

In order to sustain convictions under Section 242, sufficient evidence must have been presented for a reasonable trier of fact to have found beyond a reasonable doubt that Clark: (1) acted under color of law; (2) deprived Toland and Coleman of a right secured or protected by the Constitution or laws of the United States; (3) acted willfully; and (4) that the offense resulted in bodily injury. *See* 18 U.S.C. § 242; *see also United States v. Lanier*, 520 U.S. 259, 264 (1997). Clark does not challenge proof that he was acting under color of law or that

Coleman suffered bodily injury and so we do not address those issues.

**1.**

We first review Clark's contention that there was insufficient evidence to establish that he used excessive force during Toland's and Coleman's arrests. We affirm the District Court's holding that sufficient evidence was presented to the jury to reasonably conclude that Clark engaged in unconstitutional excessive force against both Toland and Coleman.

When reviewing a claim that an officer used excessive force in violation of the Fourth Amendment, we apply the objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388, 394 (1989). We pay careful attention to "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] [wa]s actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. We ask whether a reasonable officer on the scene would have applied the same amount of force under the circumstances, without factoring in what could have happened in hindsight since "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397. All of these factors support the jury's verdict.

*First*, the evidence presented was exceedingly scant of facts that Clark's actions were objectively reasonable in light of the circumstances. *See id.* at 396. There were no, if any, facts that Clark was responding to a crime that had been committed in either incident. In the incident with Toland, Clark rode his motorcycle onto the sidewalk heading straight

for Toland and his group and stopped his motorcycle within a very short distance from the front of them. That action could have been seen by a reasonable trier of fact as provocation since a reasonable person would be alarmed or frightened at a motorcycle driving straight at them on the sidewalk, and unnecessary since Toland and his group were not suspected of committing a crime. *See* A. 500 (government witness testifying that when Clark rode his motorcycle "up on [Toland and his group]" it was inconsistent with MPD policies since that action would not "likely . . . achieve voluntary compliance" with an officer's commands).

Further, in the incident with Coleman, the BWC footage clearly shows that no crime was being committed, and in fact shows that Coleman was requesting to file a complaint against Clark after Clark prohibited Coleman from using the restroom in the McDonald's. *See Stephens v. DeGiovanni*, 852 F.3d 1298, 1308, 1321–24 (11th Cir. 2017) (affirming a finding that an officer used excessive force when the evidence showed that the victim was not committing a crime and instead requested to speak to the defendant-officer's supervisor). It was only after Clark told Coleman that he would be barred from the restaurant and antagonized Coleman that the arguing between the two ensued. And, even then, Clark still engaged in provocation with Coleman by repeating "you want to try me, try me," Ex. B-1.1, 4:05–4:14, and stating "I know you got me. You better have me, because imma' have you. Okay, imma' have you," *id.* at 4:28–4:36, which could have been interpreted as a threat. Therefore, the evidence supported a finding by the jury that Clark's use of force was excessive under the circumstances. *See United States v. Harrison*, 671 F.2d 1159, 1162 (8th Cir. 1982) ("a lack of provocation or need to use force would make any use of force excessive.").

*Second*, a reasonable trier of fact could have concluded that neither Toland nor Coleman posed an immediate threat to the safety of Clark or others. *See Graham*, 490 U.S. at 396. For similar reasons as stated above, the evidence supports a finding that Toland posed no immediate threat to Clark, and that Clark conversely could have posed more of a threat to Toland since he drove his motorcycle straight up to Toland while Toland stood on the sidewalk. *See* A. 503 (government witness testifying "[t]hey [were] not presenting any type of aggressive posture" such as "clenching their fi[sts]" or presenting "any type of defensive stance."). Additionally, as to Coleman, there was no immediate threat to Clark or others in the McDonald's restaurant as Coleman only argued with Clark and used expletives but did not threaten Clark or anyone else in the restaurant. To the contrary, a jury could have reasonably concluded that Clark was taunting Coleman as described *supra*.

*Third*, even though there was little to no evidence presented that Clark was responding to a crime that had been committed or an immediate threat, *see* A. 1237, in both instances, Clark lunged forward and wrapped his hands around the necks of Toland and Coleman while pushing each individual back more than 30 feet and pinning them against a car and a wall, respectively. Startled, both individuals either yelled for Clark to get away from them or exclaimed that they could not breathe. In Toland's case, there was evidence introduced that Toland "attempt[ed] to defend himself" by "grabbing at [Clark], trying to get him to let go." A. 506. A reasonable jury could have concluded that this was not evidence that Toland was trying to evade arrest, but was attempting to defend himself from being in a neck restraint. In Coleman's case, he held his hands out on either side of him in an attempt to show Clark that he was not resisting arrest. This evidence, therefore, does not tend to show that Toland or

Coleman were actively resisting arrest or attempting to evade arrest by flight before Clark performed neck restraints on both individuals. *See Graham*, 490 U.S. at 396.

*Fourth*, Clark was explicitly warned by his captain that it "appeared" that Clark used "a neck restraint" on Toland and so "MPD's Internal Affairs Division had been notified about the use of force." A. 1239. Despite that warning, Clark engaged in similar behavior just five days later against Coleman. *Id*. A reasonable trier of fact could have concluded that this tended to show that, at least as it related to Coleman, Clark knew the amount of force he used was excessive under the circumstances.

Notwithstanding all of the clear evidence showing that neck restraints were prohibited, *see United States v. Brown*, 934 F.3d 1278, 1296 (11th Cir. 2019) (explaining that a police department's standards on the use of force do not substitute the constitutional use of force standard—"even when the policies attempt to mirror the constitutional reasonableness standard"), Clark also contends that his use of force was not excessive and that he could have used more force, such as his ASP-baton or pepper spray, if he so chose when arresting Toland and Coleman.

We disagree. The jury heard abundant evidence to reasonably conclude that Clark used more force than was necessary under the circumstances since neither Toland or Coleman put Clark in a life-or-death situation.[7] Clark

---

[7] Moreover, the District Court properly instructed the jury that they could consider circumstances related to Clark's use of force against Toland and Coleman such as: (1) "[t]he relationship between the need for the use of force and the amount of force used;" (2) "[a]ny effort made by the officer to temper or to limit the amount of force used;" (3) "[t]he severity of the security problem at issue, if any;" (4)

received instruction that MPD officers are required to "use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control[.]" Gov't Ex. C-7 at 2. Further, when using force, Clark was trained that he was obligated to "continuously reassess the perceived threat in order to select the reasonable use of force response, or one that is proportional to the threat faced by him[.]" *Id.*

Clark contends that "the Government failed to provide sufficient evidence of a constitutional violation based on national standards," since it only focused on MPD policies. Appellant Br. 35. This argument does not get Clark very far because: (1) MPD policies reflect constitutional standards[8]; (2) the government only needed to provide sufficient evidence that Clark used more force than was necessary under the circumstances regardless of what MPD policies provided; and (3) the District Court specifically instructed the jury that "[a] law enforcement officer's violation of a police department's policies on the use of force would not by itself establish that his actions amounted to unreasonable force." A. 1021–22.

Therefore, the *Graham* factors, and other evidence presented to the jury, weigh against Clark and support the

---

"[t]he threat, if any, reasonably perceived by the officer to the safety of the officer or any other person; and" (5) "[w]hether the individual was actively resisting arrest or attempting to avoid arrest by flight." *See* A. 1051.

[8] *See* Gov't Ex. C-7 at 1–2 (providing that "[r]egulations pertaining to the use of force by law enforcement officers" include what is provided in "the Fourth Amendment of the United States . . . Constitution . . . . [and] the objective reasonableness standard established in *Graham*[.]" (cleaned up)).

jury's conclusion that Clark used more force than was necessary under the circumstances in both instances.

**2.**

We next address Clark's contention that there was insufficient evidence that his actions were willful, because there was no evidence that he knew the neck restraints he used on Toland and Coleman were unreasonable or impermissible under MPD's training and policies. We agree with the District Court's holding that the jury was presented with more than sufficient evidence to reasonably conclude that Clark knew that, under the circumstances he faced, neck restraints were both unreasonable and prohibited under MPD's policy.

The evidence at trial showed that MPD prohibited the use of neck restraints like the trachea hold and carotid artery hold that Clark used. The government introduced one such order that Clark would have received defining a trachea hold and carotid artery hold and stating that "[t]he use of neck restraints of any kind, including but not limited to, the use of 'trachea holds' and 'carotid artery holds' are not authorized use of force options and are prohibited." Gov't Ex. C7 at 10–11 ("Whenever possible, avoid tactics that may impede a subject's ability to breathe, result in chest or throat compressions, or airway blockage."). Additionally, the order provided that "[i]n the event that a[n officer] employs a neck restraint or chokehold of any kind, [they] shall request emergency medical services immediately." *Id*. at 11.

The undisputed evidence showed that Clark was provided "an MPD-issued cell phone that had the capability of receiving emails [which] include[d] revised MPD general orders." A. 1238 (quoting Trial Tr. 1687). The jury also heard testimony that MPD officers have an obligation to familiarize themselves

with general orders, special orders, circulars, and standard operating procedures and comply with each. A. 1238 (quoting Trial Tr. 359–60). This is an ongoing duty of MPD officers as their policies and training are "relatively frequently" updated. Trial Tr. 360. Officers also attend "in-service training" at the police academy to stay abreast of "policies and procedures that were added or changed throughout the year." A. 1238 (quoting Trial Tr. 749).

In addition to the policies shown to the jury, several MPD officers testified regarding MPD's policy of prohibiting neck restraints, or allowance to use neck restraints only in life-or-death circumstances. For example, Officer George Baldwin testified that officers are only allowed to use neck restraints in "life [or] death" circumstances. A. 232. Additionally, Internal Affairs Division ("IAD") Agent George Singletary testified that officers are told neck restraints are unlawful and prohibited. A. 736. Expert witness Trevor Hewick testified that trachea holds were never allowed. A. 968. The District Court recounted that Officer Laini Evans testified "that it was restricted to do any type of neck restraints," A. 1239, and Sergeant David Chumbley likewise testified that "'neck restraints, such as trachea holds and carotid artery holds' were not authorized." A. 1240 (quoting Trial Tr. 652–54). Lieutenant Matthew Romeo testified to the same. *Id*. The evidence that Clark was informed of MPD policy and that other officers were aware of MPD policy was sufficient to prove that Clark knew that he was violating MPD policy, or that he recklessly disregarded MPD policy, when he applied the prohibited throat and neck holds. The evidence that the victims had not committed a crime, posed no threat to him, and were not attempting to resist or evade arrest, *see supra* section II(B)(1), also undermines any claim by Clark that intended to act reasonably by literally going straight for the jugular when seizing the victims. In sum, the jury heard sufficient evidence

from which it could reasonably conclude that Clark knew that he was using more force than was necessary under the circumstances since neither Toland nor Coleman put Clark or others in a life-or-death situation.

We thus affirm the District Court's holding that the jury was presented with sufficient evidence to reasonably conclude that Clark acted willfully and with excessive force.

**3.**

Clark finally contends that there was insufficient evidence that Toland suffered bodily injury as a result of Clark's excessive force. Appellant Br. 43. Clark contends that the government only presented evidence Toland suffered an injury to the leg, and that Clark could not have injured Toland's leg from the seizure or his motorcycle.

The District Court instructed the jury, with agreement from both parties, that "bodily injury" under Section 242 meant "a cut, abrasion, bruise, burn, or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ, or mental faculty; or any other injury to the body, no matter how temporary." A. 1240.

First, Clark argues that the evidence does not support a finding that Toland was injured in his leg from being hit by Clark's motorcycle notwithstanding the fact that Toland reported that he was hit in the leg by Clark's motorcycle. Appellant Br. 44–45. The District Court agreed with Clark that this theory of injury as it related to Toland was "implausible" because the BWC footage does not show that Clark hit Toland "in the back of his right calf" with his motorcycle, and the government "did not endorse Toland's

explanation of *how* he was injured in the leg." A. 1241 (emphasis in original).

However, the government presented another theory of injury—"that a reasonable juror could conclude that Clark caused Toland to suffer bodily injury to his neck." *Id.* The District Court held that the jury was presented with sufficient evidence to support this alternative theory of injury and therefore could have convicted Clark based on a bodily injury to Toland's neck. The jury was presented with evidence that Toland was distressed while attempting to unleash Clark's hands from his neck. *Id.* at 1242. Toland may have been distressed because, as the jury heard, pressure applied to the trachea can "'cause an individual to stop breathing and start panicking because they feel like they cannot breathe.'" *Id*. (quoting Trial Tr. 1249–50). We agree that this evidence was sufficient to prove Toland suffered pain to his neck and impairment to his breathing, which constitutes bodily injury. *See Griffin v. United States*, 502 U.S. 46, 59–60 (1991) (We do not "negate a verdict" on the mere chance "that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.") (citing *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991)).

\* \* \*

We therefore hold that Clark's challenge to the sufficiency of the evidence fails. It was a civil rights violation for Clark, acting under color of law, to have deprived Toland and Coleman of their right to be free from being unreasonably seized by way of prohibited neck restraints when that force was unnecessary and unreasonable under the circumstances.

## C.

Clark next argues that the government imposed criminal liability outside of the conduct charged in the indictment by way of an amendment or variance.

An indictment must contain enough detail for a defendant to understand the charges against him and be protected against re-prosecution. *See Gaither v. United States*, 413 F.2d 1061, 1066, 1072 (D.C. Cir. 1969). Typically, when there has been an amendment of an indictment "it is clear that the defendant [wa]s tried on a charge different from that approved by the grand jury." *Id.* at 1072; *see also United States v. Lawton*, 995 F.2d 290, 294 (D.C. Cir. 1993) ("For more than a century, it has been settled that 'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.'") (quoting *Stirone v. United States*, 361 U.S. 212, 215–16 (1960)). If we determine that this has occurred, we will reverse the verdict "even absent a showing of prejudice." *United States v. Lorenzana-Cordon*, 949 F.3d 1, 4–5 (D.C. Cir. 2020). A variance, on the other hand, is when the charging terms of the indictment are the same, "'but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" *Id*. at 4 (quoting *Gaither*, 413 F.2d at 1071). "Variances warrant reversal only when 'the error had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. (quoting *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006) (internal quotations omitted) and *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Clark and the government dispute whether he preserved the amendment and variance objections below, and the District Court reviewed Clark's argument for plain error when ruling on his motion for a new trial. A. 1214. We find that no

amendment or variance of the indictment occurred. We thus need not decide whether Clark's objection sufficed to preserve his argument before our Court.

The indictment stated that "[o]n or about July 13, 2018," Clark, while acting as a MPD officer, "willfully deprived [Toland] of the right . . . to be free from the use of unreasonable force by a law enforcement officer . . . . [when] Clark assaulted [Toland] and used a prohibited trachea hold without legal justification." A. 20. As explained *supra* at 7–8, the indictment alleged the same as to Coleman, but also alleged that Clark used a prohibited carotid artery hold in addition to the prohibited trachea hold during Coleman's arrest. A. 21. The jury instructions included this language from the indictment in its explanation of the nature of the offenses. A. 1048. This "fit between the jury instructions and the indictment" dooms Clark's amendment claim. *See United States v. Saffarinia*, 101 F.4th 933, 941 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 776 (2024).

Because the jury was specifically told that the nature of the offense was the same as the *actus resus* described in the indictment, Clark's variance argument can only succeed if he can show that the jury ignored these instructions and convicted him based on some other acts. "Attention to the fit between the jury instructions and the indictment is particularly important as 'jury instructions requiring the jury to find the conduct charged in the indictment before it may convict' provide the court with assurance that 'the jury convicted the defendant based solely on the conduct actually charged in the indictment.'" *Saffarinia*, 101 F.4th at 941–42 (quoting *United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014)). Clark contends that by introducing evidence of Clark's actions before the moment that he had his hands wrapped around Toland's and Coleman's throats—*i.e.* when he rode his motorcycle directly

at Toland and his friends on the sidewalk, or argued with Coleman after barring him from the McDonald's—the jury could have convicted him based on those actions rather than the illegal choke holds.

Clark's cursorily made argument does not persuade us that the jury ignored its instructions and instead convicted Clark based upon relevant evidence of the surrounding circumstances of the offense. As we pointed out earlier, *see supra* page 19, in order to determine whether an officer's force was objectively reasonable, a fact-finder may assess "the severity of the crime at issue [and] whether the suspect pose[d] an immediate threat to the safety of the officers or others" by viewing circumstances prior to the seizure. *See Graham*, 490 U.S. at 396. The video footage evidence leading up to the point that Clark had his hands around the victims' throats directly related to whether there was a crime or threat occurring that spurred Clark's actions, and whether Clark needed to use the amount of force that he did to protect himself or others. Moreover, the evidence leading up to the seizures supported the government's theory as to Clark's *mens rea*.

We agree with the District Court that "[b]y introducing evidence about the events leading up to the physical confrontations, the government was not attempting to prove a separate Fourth Amendment violation preceding the physical confrontations." A. 1214. No amendment or variance occurred here. *See Berger v. United States*, 295 U.S. 78, 83 (1935) (no material variance where the allegations in the indictment correspond with the proof at trial and no showing that the defendant was misled about the basis of his conviction).

**D.**

Clark next challenges answers the District Court gave the jury in response to two of their questions.

During day one of jury deliberations, the jury sent a note asking the District Court five questions. A. 1023. As relevant to Clark's contention, two of the jury's questions were the following:

1. What is the legal definition of unreasonable seizure, in the second element on page 26 of jury instructions.

2. This question is in regards to [the] fourth element of the offense resulting in bodily injury. Is it inclusive of any injury or just specific to injury to body parts listed [in] the counts.

*Id.*

The District Court gave the following responses to the jury:

> [F]or purposes of the Fourth Amendment, a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority. A show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business or put another way, where a reasonable person would not have believed he was free to leave. That is a definition of a seizure.

And for purposes of the question of "unreasonableness," I would refer you back to the instructions I've already provided you, where those instructions discuss reasonableness or unreasonableness with respect to use of force.[9]

The fourth question in the note- . . . . is in regards to the fourth element of the offense resulting in bodily injury. . . . Bodily injury must result from the willful use of unreasonable force but need not be limited to the specific body parts identified in my description in the substantive offenses introductory remarks. . . .

---

[9] The District Court's instructions as to reasonableness or unreasonableness with respect to use of force were as follows:

A law enforcement officer is justified in the use of any force, which he reasonably believes to be necessary to affect an arrest or hold someone in custody, and any force which he reasonably believes to be necessary to defend himself or another person from bodily harm. You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene at the moment the force was used and not with the 20/20 vision of hindsight. The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. Its proper application requires careful attention to the facts and circumstances of each particular case and the totality of the circumstances.

A. 1020–21.

A. 1043–44. The District Court's "substantive offenses introductory remarks" stated, in relevant part, "Mr. Clark used his arm and hand to apply pressure against Mr. Toland's trachea, his windpipe, and the front of his neck." A. 1048. And, that "Mr. Clark used his arm and hand to apply pressure against Mr. Coleman's trachea, his windpipe, and the front of his neck, and also that he used his arm to apply pressure and force to Mr. Coleman's carotid artery, jugular vein, and the sides of his neck." *Id*.

**1.**

"A trial court has considerable discretion in determining how to respond, if at all, to a jury's request for clarification of a jury instruction." *United States v. Laing*, 889 F.2d 281, 290 (D.C. Cir. 1989); *see also United States v. Wharton*, 433 F.2d 451, 454 n.9 (D.C. Cir. 1970) ("The feasibility and scope of any reinstruction of the jury is a matter residing within the discretion of the trial judge."). "Where the jury explicitly reveals its confusion on an issue, however, the court should reinstruct the jury to clear away the confusion." *Laing*, 889 F.2d at 290; *see also Bollenbach v. United States*, 326 U.S. 607, 612–13, (1946) ("When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy."); *United States v. Bolden*, 514 F.2d 1301, 1309 (D.C. Cir. 1975) (same). "A court may go beyond the limits of the jury's request for clarification to avoid giving a misleading or one-sided answer." *Laing*, 889 F.2d at 290. "Moreover, the court must consider the propriety of the supplemental instruction in light of the other instructions previously given." *Id.*; *see also Vauss v. United States*, 370 F.2d 250, 252 (D.C. Cir. 1966) ("We must read the dubious supplemental instruction along with the principal instruction and consider the matter as a whole[.]").

Our standard of review in determining whether the District Court properly responded to the jury's questions is deferential to the District Court. "When reviewing a challenge to jury instructions, '[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards.'" *Vega*, 826 F.3d at 524 (quoting *Wilson*, 605 F.3d at 1018). "While the propriety of a submitted jury instruction is reviewed *de novo*, 'the choice of language to be used in a particular instruction...is reviewed only for abuse of discretion.'" *Id.* (quoting *Joy*, 999 F.2d at 556); *see also Wharton*, 433 F.2d at 454 n.9.

Clark contends that the District Court erred in instructing the jury as to the definition of "seizure" and should have given a definition found in the Supreme Court's decision in *Torres v. Madrid*, 592 U.S. 306, 325 (2021) ("[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."). Clark asserts that the definition given by the District Court allowed the jury to consider Clark's conduct leading up to the seizures instead of focusing on the seizures themselves, similar to his contention that the government amended or varied from the indictment in presenting its case discussed *supra* pages 28–31. Appellant Br. 55.

We find no abuse of discretion here. Clark identifies no legal error in the definition of "seizure" given by the District Court. While Clark prefers the particular articulation from *Torres*, that case involved defining whether a seizure occurred "when an officer shoots someone who temporarily eludes capture after the shooting," 592 U.S. at 309, circumstances far different from the present case. Clark's contention that the supplemental instruction allowed the jury to convict him based on conduct leading up to the seizures is unpersuasive for the

same reasons we rejected his amendment and variance arguments, particularly since the supplemental "seizure" instruction directed the jury to focus on "reasonableness or unreasonableness with respect to use of force" and referred to force used on the neck and throat area.

**2.**

Clark next argues that the District Court erred in answering whether bodily injury was inclusive of any injury or only specific to injuries to body parts listed in the indictment.

However, Clark has once again raised an issue to which he failed to object to below. Specifically, when the District Court asked Clark whether he was "okay with" the District Court answering the jury's question by explaining that the bodily injury "need not be limited to the specific body parts listed in the substantive offenses introductory remarks," Clark responded "I don't think I have a choice. I think that's the law." A. 1033. Therefore, we review the District Court's answer for plain error. *See United States v. Clarke*, 24 F.3d 257, 266 (D.C. Cir. 1994).

We find no plain error. The District Court's answer explained that the bodily injury must have resulted from the willful use of unreasonable force by Clark. Therefore, as long as the jury concluded that the bodily injury was due to Clark's use of excessive force—*i.e.* the use of prohibited neck restraints in a circumstance where life-or-death force was unnecessary—it could find that the government proved the bodily injury element under Section 242 beyond a reasonable doubt. Further, as discussed immediately above, the jury was instructed to focus its attention on the reasonableness of the force that Clark used in the neck and throat area.

**E.**

Lastly, Clark contends that the District Court erred in declining to allow him to admit statements of patrons who were inside the McDonald's during Clark's incident with Coleman, as well as Coleman's arrest and mental-health records.

**1.**

We review the District Court's evidentiary decisions for an abuse of discretion. *United States v. Ramsey,* 165 F.3d 980, 983 n.3 (D.C. Cir. 1999); *see also Clarke*, 24 F.3d at 267.

After Clark seized Coleman, other officers went back inside of the McDonald's to interview patrons about their eyewitness accounts of the incident between Clark and Coleman. Clark now loosely contends that the District Court erred in not allowing statements made by patrons to come into evidence through the present sense impression hearsay exception.

Federal Rule of Evidence 803(1) defines a present sense impression as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." The "core concept" of this exception is that the hearsay statement comes in because it is "so closely related to the event—either because it is contemporaneous with the event or because the event spontaneously prompts the statement— that the statement is likely to be trustworthy." EDWARD J. IMWINKELRIED ET AL. 1 COURTROOM CRIMINAL EVIDENCE § 1202 (2025). Moreover, a "declarant's statement about an event is exceptionally admissible if the declarant made the statement while observing the event." *Id*.; *see also Navarette v. California*, 572 U.S. 393, 400 (2014) ("[S]ubstantial contemporaneity of [an] event and statement negate the

likelihood of deliberate or conscious misrepresentation."). We have previously upheld the exclusion of statements made fifteen minutes or more after an event as too far removed to qualify as a present sense impression. *Hilyer v. Howat Concreate Co.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978).

Although Clark loosely contends that the District Court erred in not allowing these patron statements to be admitted into evidence, he does not tell us why these statements would even qualify as present sense impressions. Clark's opening brief is bare of any facts regarding how much time passed between when the patrons viewed the incident between Clark and Coleman and when they gave their statements to officers, notwithstanding his burden to demonstrate admissibility. *See United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003) (explaining that for a statement to meet a hearsay exception, "the proponent of the exception must establish" it); *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) (explaining that arguments are forfeited if they were raised in an "obscure" way in the "opening brief and" only later raised in a more concrete way in the reply brief).

It appears that some of the statements were made approximately forty-five minutes after the incident, which fails the contemporaneous standard. *See Hilyer*, 578 F.2d at 426 n.7. Other statements, while made sooner after the event, were nonetheless made after the witnesses had an opportunity to reflect upon what happened, in response to questioning, and after the witnesses likely spoke with each other inside the store and overheard other accounts and descriptions. All of those factors undermine the spontaneity and reliability of those statements. Thus, we find no abuse of discretion by the District Court in excluding these various statements as present sense impressions. *See United States v. Woods*, 301 F.3d 556,

562 (7th Cir. 2002); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007).

**2.**

Before concluding, we address Clark's final contention—that the District Court erred in not allowing Clark to introduce evidence related to Coleman's other arrests as well as his mental health record.

Because the government had not confirmed whether Coleman was going to testify, the District Court withheld a decision on whether Clark could cross-examine Coleman with his arrest and mental health records until the issue became ripe. Then, the government chose not to call Coleman as a witness, and the trial proceeded without the District Court having to rule on whether Clark could use the records to cross-examine Coleman.

Clark now asserts that the district court abused its discretion in "precluding [him] from presenting all of this evidence at trial," Appellant Br. 62, even though he never sought to admit this evidence outside of the context of cross-examination. This issue is forfeited.

We also hold that the District Court did not abuse its discretion in prohibiting Clark from using video evidence of Coleman's other arrests for the purpose of eliciting testimony from the government's expert witness on the reasonableness of force exhibited in those arrests compared to Clark's seizure of Coleman. The amount of force used by other officers when seizing Coleman at other times and under completely different circumstances has little, if any, relevance to whether Clark used unreasonable force during this particular arrest of Coleman. The District Court did not err in concluding that this evidence

would have had "little probative value as impeachment evidence directed to the credibility of the government's expert[.]" A. 1218. Instead, that evidence could have confused the jury by having it weigh the use of force in arrests not at issue.

We therefore affirm the District Court's evidentiary rulings.

## III.

For the foregoing reasons, we affirm the District Court's denial of Clark's motion for acquittal, denial of the motion for a new trial, and affirm Clark's convictions.

*So ordered.*